IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 10-607 |
| | ) | |
| RICHARD CARTER, an individual; | ) | |
| JERRY GOODWIN, an individual; | ) | |
| R&J FEED CO., a Utah partnership, and | ) | |
| CARTER LIVESTOCK, INC., a Wyoming | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, the United States of America, alleges as follows:

## Overview

1.     This is an action by the United States to recover damages and civil monetary

penalties under the False Claims Act ("FCA"), 31 U.S.C. § 3729-33, as well as damages and/or

disgorgement on the basis of unjust enrichment. The claims are against R&J Feed Company

("R&J") (sometimes referred to by its partners as "R&J Feeds"), R&J's partners Jerry Goodwin

("Goodwin") and Richard Carter ("Carter"), and Carter Livestock, Inc., a Wyoming corporation

("Carter Livestock"), in connection with 2002 and 2003 non-fat dry milk ("NDM") drought

relief programs of the United States Department of Agriculture ("USDA"). These programs,

which were conducted through a Kansas City, Missouri office of the USDA, were intended to aid

livestock producers in designated Western states that were afflicted by drought during those

years. The programs utilized large stores of NDM held by the USDA's Commodity Credit

Corporation ("CCC") in various warehouses across the country. Each of the programs provided NDM at essentially no charge, for incorporation in livestock feed.

2.    Use of the NDM provided in the three programs was subject to well-defined and well-publicized restrictions. All of the programs had the common feature that the NDM had to be used in feed for livestock within the states to which the programs applied ("the Drought States"). The usage restrictions were important to the government for several reasons, including that unpermitted use could disrupt domestic markets in currently-produced milk products; that the exportation of the NDM could cause complications in international relations; and that because of USDA milk price support programs, to the extent that the NDM provided in the drought relief programs were sold for a purpose that displaced commercial purchases of currently-produced milk products, the CCC could be required to buy up more of such products.

3.    Each of the defendants violated the terms of one or more of the NDM drought relief programs, and made false or fraudulent claims or representations under one or both of the programs. Under the 2002 program, Carter and Carter Livestock acquired large stores of NDM from the USDA through false representations and certifications that the NDM would be or had been used for the manufacture of cattle feed, and received payments from the USDA under the false certification that Carter Livestock had manufactured feed incorporating the NDM and had delivered it to livestock producers. In fact, millions of pounds of this NDM was delivered to R&J for its use. Under the 2003 drought relief program, R&J acquired NDM provided by the USDA in part by knowingly causing false certifications to be submitted to the USDA, to the effect that the NDM would be used in compliance with the 2003 program restrictions. R&J exported or participated in the exportation of millions of pounds of 2002 and 2003 program

2

NDM, at a profit of millions of dollars. R&J, Carter and Goodwin were aware that all of the millions of pounds of NDM that R&J exported, or in whose exportation they participated, was subject to restrictions that would prohibit its exportation.

### Jurisdiction and Venue

4.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under laws of the United States; 28 U.S.C. § 1345 because the United States commenced this action; 28 U.S.C. § 1355(a) because this action seeks recovery of fines and penalties; and 31 U.S.C. §§ 3730 and 3732(a), because this is a civil action brought in part under the FCA. The Court has original jurisdiction over all of the claims in this action; however, even if its original jurisdiction did not cover all claims, the Court would have supplemental jurisdiction over the remainder, including all common law causes of action, under 28 U.S.C. § 1367(a), because all remaining claims would be so related to claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.  The Court may exercise personal jurisdiction over the defendants because they have conducted business in this district in connection with the subject matter of this action, in that they had dealings with offices of the USDA located in Kansas City, Missouri, in connection with the NDM drought relief programs, including in that they ordered NDM or knowingly caused NDM to be ordered by other parties through the Kansas City offices and, in the case of Carter and Carter Livestock, submitted to the Kansas City offices false invoices for the manufacture and delivery of feed.

3

6.     The Court may exercise personal jurisdiction over R&J, Carter and Goodwin for the further reasons that they have availed themselves of this Court in connection with the NDM drought relief programs, namely by the filing of *R&J Feed Co., et al. v. United States, et al.,* Case No. 4:08-CV-00623-DW, in which Goodwin and Carter were plaintiffs and the United States and seven current or former employees of the USDA were defendants; and *Carter, et al. v. High Country Mercantile, Inc., et al.,* Case No. 4:08-CV-00835-ODS, in which Carter and Goodwin were plaintiffs; and Carter and Goodwin further availed themselves of this Court by causing subpoenas to be issued to USDA officials in the latter action, to appear in this district for deposition testimony in regard to the NDM drought relief programs, and by deposing those USDA officials in this district.

7.     In addition, the Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), in that they transacted business in this district and committed acts proscribed by 31 U.S.C. § 3729 in this district.

8.     Venue is proper in this district under 31 U.S.C. § 3732(a) because defendants have transacted business in this district, and under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to claims herein occurred in this district.

## Parties

9.     The plaintiff is the United States.  It brings this action on behalf of the USDA, which conducted the NDM drought relief programs through its subagency the Farm Service Agency ("FSA") and the CCC, a government owned and operated entity within the USDA, whose operations are carried out primarily through the personnel and facilities of the FSA.

4

10.     Defendant Carter Livestock, Inc. is a Wyoming corporation.  Its registered agent is Richard Carter, HC 30 Box 2460, Ten Sleep, Wyoming 82442.

11.     Defendant R&J Feed Company is a Utah partnership whose partners are defendants Richard Carter and Jerry Goodwin.

12.     Defendant Richard Carter is an individual who resides in or near Ten Sleep, Wyoming, and is the president of Carter Livestock, Inc. and a partner in R&J Feed Company.

13.     Defendant Jerry Goodwin is an individual who resides in Ogden, Utah, and is a partner in R&J Feed Company.

### The False Claims Act

14.     The FCA, at 31 U.S.C. §3729(a)(1), provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."

15.     The FCA, at 31 U.S.C. § 3729(a)(1)(B) (2009), as amended and made retroactive by the Fraud Enforcement and Recovery Act of 2009 (FERA), provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ."

16.     At 31 U.S.C. § 3729(b), the FCA defines the term "knowingly," as applicable in the above provisions, to mean that a person, with respect to information, "(1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information"; and further provides that no proof of specific intent to defraud is required.

## Background Facts

**A.     The 2002 program and the involvement of Carter and Carter Livestock**

17.     The 2002 program was called the Cattle Feed Program, or "CFP."  The program covered Colorado, Nebraska, South Dakota and Wyoming.  Under the CFP, ranchers within these states who had "foundation" herds of cattle (beef cows, bulls, and replacement heifers) were allocated a dollar amount of feed, depending on the size of the eligible herd certified by the ranchers to the local county office of the FSA.  The producer (i.e. livestock owner) would designate a feed dealer or feed dealers to provide the producer with the feed.

18.     Feed dealers participating in the 2002 program could order an unlimited amount of NDM through the Kansas City Commodity Office ("KCCO") of the Dairy & Domestic Operations Division of the FSA, located in Kansas City, Missouri, subject to the requirement that the NDM could only be used by incorporating it in feed provided to livestock producers participating in the program.  The USDA's charge to the dealer for the NDM was one cent per twenty-five kilogram (55.115 pound) bag.  The cost of transporting the NDM to the dealer was paid by the USDA.  Under the CFP, the dealer was to provide the feed containing NDM to the livestock producer free of charge, and invoice the FSA for the feed at the same rate that the dealer would charge non-participants for the type of feed that was combined with the NDM.  Invoices were sent to the Kansas City Finance Office of the Financial Operations Division of the FSA, in Kansas City, Missouri ("Kansas City Finance Office.").

19.     There were two primary documents that governed the program. The first was a Form FSA-551, titled "Cattle Feed Program (CFP) Application." In this form, a foundation herd producer would certify the number of eligible livestock owned. This number would be multiplied by a dollar multiplier to determine the total dollar amount of feed for which the producer would be eligible. The producer would also indicate on the form the name and address of the feed supplier through whom the producer wished to obtain the feed.

20.     The second form governing the 2002 program was Form FSA-552, titled "Cattle Feed Program Agreement." This was an agreement entered between a feed dealer participating in the program and the FSA. The Cattle Feed Program Agreement recited that it was entered in order to implement the CFP, under which the FSA would provide financial assistance to eligible owners of cattle to purchase feed. The Cattle Feed Program Agreement provided, inter alia: (1) that by signing the agreement, the dealer agreed to provide feed to producers that had designated that dealer, in the dollar amounts specified on their Forms FSA-551; (2) that the feed was required to contain NDM provided by the CCC for use in the program; (3) that the dealer was to invoice the FSA for the feed provided to the producers, and that the invoice price was to be the same price per unit as the contractor provided feed to other (non-participant) producers; (4) that at a price of one cent per twenty-five kilogram bag, the CCC would provide the contractor CCC-owned NDM for use as a portion of the protein component of the feed made available under the program; (5) that the NDM acquired from the CCC would be used only in making feed for eligible producers under the program; and (6) that if the quantity of NDM purchased from the CCC exceeded the quantity needed to make feed available to eligible producers, the dealer would report the excess to the CCC, and could, after receiving approval from the CCC, use the

7

NDM to make feed for sale to owners of foundation beef cattle who were not participants in the program. The agreement identified an employee of the KCCO as the contact for ordering NDM.

21. On October 3, 2002, Richard Carter entered a Form FSA-552 on behalf of Carter Livestock as feed dealer. Carter Livestock also submitted an FSA-551 in its capacity as a livestock producer.

22. Under the CFP, dealers acquired NDM by submitting Cattle Feed Program NDM Order Forms to the KCCO. Between September 25, 2002 and January 13, 2003, Carter Livestock submitted ten of these forms to the KCCO, each signed by Carter. On each of the forms, Carter certified that all NDM purchased would be used for the manufacture of cattle feed under the 2002 program. Pursuant to these orders, the USDA shipped approximately 19.9 million pounds of NDM to the receiving points designated by Carter, at a shipping cost of approximately $810,000.

23. Under the 2002 program, dealers invoiced the FSA on a form titled "FSA-2002 Cattle Feed Program Dealer Invoice / Transmittal" ("CFP invoice"). On the CFP invoice, the dealer was required to identify the producers to whom NDM-containing feed was delivered, and for each the number of tons delivered, the feed cost per ton, and the total dollar amount of the invoice for feed provided to that producer. In addition, if the dealer was not also the manufacturer of the NDM-containing feed, it was required to identify the supplier of the feed. Otherwise, the dealer was required to state the total number of bags of NDM used in the manufacture of the feed listed on the invoice. The dealer was also required to sign the following certification on each CFP invoice:

> The feed represented by this invoice was delivered specifically to qualified
> producers under FSA's 2002 Cattle Feed Program. Any CCC-owned NDM

8

received from CCC was used in the production of livestock foundation beef cattle feed. The price of such feed represented by this invoice was delivered to the qualified producer at the same price as invoiced to FSA.

24. On behalf of Carter Livestock, Carter submitted to the Kansas City Finance Office three CFP invoices, dated October 21, 2002, November 12, 2002, and January 2, 2003, each signed by Carter as its president. Through these, Carter Livestock invoiced the USDA for 15,972 tons of feed, representing and certifying that that amount had been delivered to various participating livestock producers in individual amounts specified. The total of the invoices was $263,649. On the basis of and in reliance on these invoices, the USDA paid this amount to Carter Livestock. On each of the invoices, Carter indicated that Carter Livestock was both the dealer and the manufacturer of the feed.

25. Carter and Carter Livestock, as a feed dealer under the CFP, failed to abide by the requirements of the Cattle Feed Program Agreement, in that they did not use the NDM that the USDA provided them under the CFP only in making feed for eligible producers, but rather diverted it to other uses, including its exportation.

26. Carter and Carter Livestock did not comply with the Cattle Feed Program Agreement, in that they received under the 2002 program substantial quantities of NDM that were not used in making feed available to eligible producers, and they did not report such excess to the CCC.

27. Upon information and belief, Carter and Carter Livestock used substantially all of the NDM provided to Carter Livestock under the Cattle Feed Program for purposes other than manufacturing feed containing NDM under the Cattle Feed Program.

9

28.     Upon information and belief, at the time Carter entered the Cattle Feed Program Agreement on behalf of Carter Livestock, neither Carter nor Carter Livestock intended to comply with any of the provisions of the Cattle Feed Program Agreement recited above in paragraph 20, and neither Carter nor Carter Livestock did so comply.

29.     Carter and Carter Livestock failed to abide by the certification made on each of the Cattle Feed Program NDM Order Forms they submitted to the KCCO, in that the NDM purchased was not used for the manufacture of cattle feed under the Cattle Feed Program as or to the extent indicated.

30.     Upon information and belief, at the time that Carter and Carter Livestock submitted each of the Cattle Feed Program NDM Order Forms, they did not intend to abide by the certification made to the USDA that all NDM so purchased would be used for the manufacture of cattle feed under the Cattle Feed Program.

31.     Upon information and belief, the certification made by Carter and Carter Livestock on each of the three invoices they submitted to the USDA under the 2002 program was false, in that (1) the feed represented in the invoice had not been delivered to the producers as or to the extent indicated; and (2) NDM received from the CCC was not used in the production of cattle feed as or to the extent indicated.

32.     Each of the provisions of the Cattle Feed Program Agreement violated by Carter and Carter Livestock, and each of the false certifications and representations made by Carter and Carter Livestock in the Cattle Feed Program NDM Order Forms and The Cattle Feed Program invoices was material, and the USDA relied on them in providing NDM to Carter Livestock.

10

**B.    The 2003 NDM drought relief program and the involvement of R&J**

33.    The 2003 program, named the "2003 Livestock Feed Assistance Initiative" ("LFAI"), was announced by the Secretary of Agriculture on April 8, 2003.  The number of states covered by the program grew over time, but ultimately included Arizona, Colorado, Idaho, Kansas, Montana, Nebraska, New Mexico, South Dakota, Utah and Wyoming.  The 2003 program differed from the 2002 program in that a portion of the administrative function of the program was shifted to the participating states, and in that the program did not involve USDA monetary payments to feed manufacturers or dealers.

34.    Under the program, the USDA made NDM available to the Drought States for $1.00 per truckload (about 42,000 pounds, or 21 tons) for use in feeding foundation livestock. The participating state was to determine the allocation of the NDM among producers within the state, and typically did so through the state agriculture department.  This involved issuing vouchers in amounts proportional to a producer's self-certified herd size.  These vouchers could be redeemed through the state that issued them, which would order a corresponding amount of NDM from the KCCO, to be shipped to a location directed by the holder of the voucher.

35.    The principal governing document in the program was a uniform agreement entered between the CCC and a participating state, titled "Nonfat Dry Milk Sales Agreement Between the Commodity Credit Corporation and the State of _____" ("Sales Agreement"). The Sales Agreement stated that the CCC was agreeing to sell the state NDM for distribution to livestock producers suffering from drought conditions.  It further stated that the price would be $1.00 per truck lot, with transportation costs to be paid by the CCC to distribution points designated by the state.

11

36.     Paragraph II E of the Sales Agreement stated the following restrictions on the use of the NDM:

>    The NDM sold by CCC may only be used for feeding foundation livestock herds and may not be sold or exchanged for human consumption, except that the producer may sell or exchange the NDM to acquire feed containing NDM for their foundation livestock herd.  Regardless of how the NDM is acquired by a third party (that is, by a party other than the State or eligible producer), all uses are permitted subject to the following limits:  (1) the NDM may not be used as a replacement for whey or whey products; (2) the NDM may not be processed for or used for human consumption; (3) ultimate consumption of the NDM so acquired must be "in-state," that is, in the state allocated the NDM; (4) such NDM may, however, be processed outside that state if returned by or from the processor directly to the originating state (the state that was allocated the NDM under this agreement) and consumed in the originating state; (5) consumption of the NDM by live stock normally housed in-state will be considered to be consumption "in-state" even though the herd is quartered temporarily elsewhere; (6) the third party must acknowledge and agree to these limitations; (7) the third party shall, upon inquiry, certify to the disposition of the NDM for the proper use and certify to compliance with all other limitations of this agreement on the use of the NDM and the products made from it.

37.     By early May, 2003, the restrictions set forth in paragraphs II E (3) and (4) that the NDM had to be consumed within the particular state to which it was allocated, was modified by an agreement between the CCC and the participating states, titled "Multi-State Agreement for Exchange of Non-fat Dry Milk (NDM)" (the "Multi-State Agreement").  This agreement stated that its purpose "was to allow for the exchange of NDM or feed materials containing NDM among producers or processors within the participating states."  The Multi-State Agreement thus made it permissible to acquire NDM through one of the participating Drought States, and to use it to feed livestock in another of the participating Drought States.

38.     The Sales Agreement, as modified by the Multi-State Agreement, thus established a universal restriction that the 2003 program NDM could only be used to feed livestock within or normally quartered within one of the Drought States.

12

39.     Pursuant to the 2003 program, the participating states entered agreements with participating producers and feed dealers, and had direct communications with them.

40.     Between April 2003 and December 2003, R&J enrolled in the 2003 program as a feed manufacturer and dealer through at least the states of Wyoming, Utah, Idaho and Colorado. Through various forms of agreement between feed dealers and states by which feed dealers agreed to participate in the 2003 program ("participation agreements") and various communications from officials in these states and the USDA, R&J, Goodwin and Carter knew by the beginning of their participation in the program and throughout the course of their participation that all 2003 program NDM was subject to the restrictions set forth in the Sales Agreement as modified by the Multi-State Agreement. Participation agreements executed by Goodwin on behalf of R&J with Utah in May 2003 and Idaho in November 2003 expressly set forth the use restrictions, and a Memorandum of Understanding entered between R&J and Colorado in December 2003 expressly incorporated the terms of the Sales Agreement, which was an attachment to the Colorado Memorandum of Understanding. In addition, R&J, Goodwin and Carter, in order to acquire NDM from the USDA, submitted to various states NDM voucher forms received in their capacities as livestock producers or acquired from livestock producers, and in these forms agreed to and represented that they would comply with the 2003 program restrictions.

13

**C.**     **R&J's acquisition of 2003 program NDM**

41.     The USDA issued two forms for use in the distribution of NDM in the 2003 program.  The first was a Form "KC-327 Dairy-NDM," titled "2003 Livestock Feed Assistance Nonfat Dry Milk Program, NDM Order Form" ("2003 NDM Order Form").  The form was used by Drought State officials in ordering NDM shipments from the USDA.  The form required designation of a receiving point for the NDM, the number of truckloads ordered, and a requested delivery period.  The top of the form stated the admonition:  "Order for Nonfat Dry Milk (NDM) is subject to the terms and conditions of the Nonfat Dry Milk Sales Agreement."  At the bottom of the form, the state official signing the form was required to certify as follows:

> By signing below, the requestor certifies that all NDM purchased is to be used in the manner as documented by their State or Tribal Government's Nonfat Dry Milk Sales Agreement with Commodity Credit Corporation (CCC).

The form indicated that it was to be delivered to the KCCO.

42.     At all times that R&J, Goodwin and Carter were involved in the acquisition of NDM distributed by the USDA under the 2003 program, they were aware of the content of this form, and were aware that the form was used as the basis for shipments of NDM by the USDA under the 2003 program, and that when orders for 2003 program NDM were submitted by or on behalf of R&J to state officials, the state officials would in turn submit a 2003 NDM Order Form, with its certification of usage in compliance with program restrictions, to the KCCO.

43.     The second form was a Form "KC-327 Dairy-NDM 1," titled "2003 Livestock Feed Assistance Nonfat Dry Milk Program, Authorization for Destination of NDM Deliveries" ("2003 NDM Delivery Form").  This form was to be submitted by a participating state to the KCCO, to provide information pertinent to the mechanics of delivery, including designation of a

contact person.  Jerry Goodwin caused this form to be submitted on behalf of R&J, designating "791 West 9300 South 35, Ogden, Utah" as R&J's receiving point.

44.     R&J acquired 2003 program NDM by three methods.  First, Carter and Goodwin directly acquired NDM vouchers -- both vouchers issued to Carter and/or Goodwin in the capacity of producer, and vouchers assigned to R&J by other producers -- and used these to secure shipments of NDM by the USDA.

45.     A second means by which R&J acquired NDM was by purchasing voucher assignments through High Country Mercantile ("High Country"), a broker in Cody, Wyoming. High Country would acquire rights to 2003 drought relief program NDM by acquiring from feed mills vouchers issued by various states.  R&J would purchase the entitlement to NDM shipments represented by these vouchers from High Country, and the vouchers would in turn be used to have the states that issued the vouchers submit 2003 NDM Order Forms to the KCCO for NDM shipments to R&J or its designee.  The KCCO would then arrange and pay for the shipment.

46.     In connection with its NDM sales to R&J, High Country required R&J to enter form agreements titled "Non-fat Dry Milk Usage Certification/Representation Required Pursuant to the USDA Non-fat Dry Milk Sales Agreement" ("Usage Agreement").  The Usage Agreement referred to the 2003 program and the Sales Agreement, and enumerated restrictions on usage of the NDM, including that it had to be used for feed in one of the Drought States.  The form required the signatory to certify that "products sold by the undersigned pursuant to the Program shall only be sold in accordance with the requirements provided above."  R&J executed a Usage Agreement for each of its purchases of NDM through High Country.

15

47.     Acquisition of NDM by R&J by through the first or second method involved direct shipments of 2003 NDM to R&J or its designee by the USDA, in response to 2003 NDM Order Forms submitted to the KCCO by Drought States on behalf of R&J.

48.     Between June 2003 and February 2004, R&J caused approximately 23 2003 NDM Order Forms to be submitted to the USDA, knowing that each bore the certification by a state official that the NDM so ordered would be used only in conformity with the 2003 program restrictions.

49.     During the period September 2003 through February 2004, the USDA shipped approximately 8,052,000 pounds of NDM to R&J pursuant to these orders, at a shipping cost of approximately $238,000.

50.     The third method by which R&J acquired 2003 program NDM was by purchasing stores of NDM that had already been acquired by one or more other entities.  Through High Country, R&J acquired approximately 3,832,000 pounds of 2003 program NDM that had been held by Banner Feed Company in Harrisburg, Nebraska.  R&J acquired millions of pounds of 2003 program NDM directly from other entities as well.  At all relevant times, R&J knew that this was 2003 program NDM that had been distributed by the USDA and that was subject to the 2003 program restrictions.

D.     **The January 2004 warehouse examination and its aftermath**

51.     In January 2004, the Warehouse Licensing and Examination Division of the KCCO undertook a warehouse examination of R&J's warehouse near Ogden, Utah.  USDA warehouse examiner Rod Prather ("Prather"), who was supervised by Robert Walsh ("Walsh") of the KCCO, was sent for the examination.  Prather was accompanied by Dwight Cundy

16

("Cundy"), an Auditor in the USDA Office of the Inspector General ("OIG"). The warehouse exam began on January 19, 2004, and concluded with a written report issued January 29, 2004.

52. Prather and Cundy could not locate R&J's warehouse from the delivery address indicated on R&J's 2003 NDM Delivery Form, because it was a non-existent address. After telephoning R&J, they met Goodwin and R&J's Manager, Shane Smith ("Smith"), at a truckstop and proceeded to R&J's warehouse, referred to as the "Little Mountain warehouse." Prather did an inventory of the NDM, which indicated that there were approximately 8,533,800 pounds of NDM stored there. Goodwin and Smith stated that this had been shipped from Wyoming.

53. Representations to Prather and Cundy made or endorsed by Goodwin on January 19, 2004 included that: (1) some of the NDM had been shipped to Wyoming to feed cattle; (2) approximately 150 tons of feed had been produced; (3) R&J had no production or shipping records; (4) all NDM that had been obtained by R&J had either been fed to livestock or processed into pellets, with the exception of a few loads that had been sent to Hay-Pro, a company in Idaho; and (5) the Little Mountain warehouse was the only warehouse in which R&J stored NDM.

54. At the Little Mountain warehouse, Prather noted that there was a machine, represented to him as a machine for making feed pellets, that was not operational. It was clear to Prather that there had been no recent activity at the warehouse. There was not even a forklift to unload NDM, which was inconsistent with USDA records showing frequent deliveries to R&J. When Prather asked Goodwin about this, Goodwin indicated that all of the NDM that had not been made into feed was there.

17

55.    As a result of a previous warehouse exam of another company, Prather was aware of a warehouse complex in Ogden, known as "the DOD facility," which was a former Department of Defense facility.  After the initial meeting with Goodwin and Smith, Prather determined through investigation that R&J had an undisclosed warehouse at the DOD facility ("the DOD warehouse").  Prather and Cundy went there and discovered that R&J had an active operation there, involving approximately ten employees.  They were repalletizing pallets of NDM, shrink-wrapping it, and preparing it for shipment.  Trucks containing USDA NDM deliveries to R&J were being diverted by R&J from the given delivery address, which was non-existent.  Upon calling the R&J contact person, truckers were diverted to the DOD warehouse. 2002 program NDM and 2003 program NDM were also being blended and prepared for shipping.  NDM was being trucked in shipping containers to the Union Pacific Railroad.  The DOD warehouse manager indicated that the warehouse had been in operation since approximately November 1, 2003.

56.    Prather took an inventory of NDM on hand at the DOD warehouse.  He estimated that there were 990,000 pounds of 2003 program NDM and 579,425 pounds of 2002 program NDM.  Broken bags of NDM were emptied into totes containing approximately 1,980 pounds of NDM each.  Prather estimated that there were 100 such totes.

57.    Prather and Cundy then met again with Smith, and confronted him with what they had discovered.  Smith told them that (1) both the 2002 NDM and the 2003 NDM were being exported, and NDM was being sold through a broker in Weiser, Idaho doing business as Dee Van Tassell Enterprises ("Van Tassell"); (2) any NDM delivered before November 1, 2003 was delivered to the Little Mountain warehouse and later transferred to R&J's DOD warehouse; (3)

18

the NDM was being sold for 22 cents per pound; (4) R&J intended to make feed pellets with the NDM in the totes; (5) only approximately 1.5 tons of feed pellets had been manufactured; (6) no NDM had been shipped back to Wyoming; and (7) no NDM had been shipped to Hay-Pro in Idaho, and that Hay-Pro and Van Tassell Enterprises were the same entity.

58.     Smith also revealed to Prather that R&J in fact had records of NDM shipments for exportation.  He agreed to forward the records to Prather.

59.     On January 26, 2004, Smith sent Prather and Cundy spreadsheets showing the quantity and destination of R&J shipments of NDM made between November 4, 2003 and January 23, 2004.  Smith told Prather that the shipments shown were for exportation.  One of the spreadsheets showed 7,953,678 pounds of NDM having been shipped from the R&J DOD warehouse to the Netherlands, Estonia, Germany and the Philippines.  Another showed 3,052,001 pounds of NDM shipped from Wyoming to El Paso, Texas.  A third showed 3,832,380 pounds of NDM purchased through High Country and shipped directly from Banner Feed Company in Nebraska to El Paso, Houston, Oakland and a company called West Coast Hay.

60.     On the basis of the January 2004 R&J warehouse examination and the information provided to him by Smith, Prather determined that at the time of the warehouse examination, R&J had an inventory of 9,311,225 pounds of 2002 NDM and 990,000 pounds of 2003 NDM, for a total inventory of 10,301,225 pounds of USDA drought relief program NDM.

61.     The information provided by Smith indicated that R&J had exported or participated in the exportation of 14,838,059 pounds of NDM between November 4, 2003 and January 23, 2004.

19

62.     Following the January 2004 warehouse examination, the USDA stopped NDM shipments to R&J.  On February 10, 2004, Goodwin and Carter called Walsh of the KCCO about this.  Walsh stated to them that exporting the NDM was a direct violation of the program.  Goodwin and Carter initially denied that they knew that R&J was exporting NDM, but when told that Smith had provided information to the contrary, they stated that the NDM was being exported as animal food only and that they were not the exporter of record.

**E.      Subsequent Communications Between the KCCO and R&J regarding 2002 NDM**

63.     On February 27, 2004, Paul Rodriguez ("Rodriguez") of the KCCO, who had administrative responsibility with regard to the 2002 program, wrote to Carter, stating that all 2002 NDM used in the 2003 program must be used in a manner that complies with the requirements of the Sales Agreement, and that otherwise, Carter would be subject to the 2002 program restrictions.  Rodriguez asked Carter to provide him weekly updates reporting the quantity of NDM feed produced and the disposition of the feed, including identification of the companies or producers to whom the feed was sold.  Rodriguez also asked for documentation on the disposition of any 2002 NDM already used beyond use in the 2002 program.

64.     On March 11, 2004, Rodriguez received a call from Carter, Goodwin and Smith regarding the approximately 8.5 million pounds of 2002 NDM stored in the Little Mountain warehouse.  They stated that the NDM was being moved to the DOD facility.  Goodwin stated that the pellet mill was running and that they had made 300 to 400 tons of pellets.  Goodwin stated that because of limited space in the DOD facility, R&J had shipped about 50% of the NDM to Van Tassell in fulfillment of a contract.  Rodriguez asked them to put this information in writing.

20

65.     On March 16, 2004, Carter sent a fax to Rodriguez, stating that since the USDA visit in January, the pellet mill had been in full operation.  Carter stated that the pellets were being fed primarily to foundation cattle in Wyoming.  He stated that approximately 600,000 pounds of NDM had been used to produce the pellets, that there were another 3.2 million pounds of NDM still in the warehouse, and that 2.2 million pounds of NDM had been sold "to the contract in Idaho."  On April 12, 2004, Carter reported that 18,000 pounds of NDM had been used to produce pellets, and that 870,000 pounds of NDM "were sold to the contract in Idaho."  On April 23, 2004, Carter responded that another 1.26 million pounds of NDM had been "sold to the contract in Idaho," and that the remainder of the 2002 NDM was made into pellets.

66.     In short, Goodwin and Carter represented to Rodriguez in March and April 2004 that more than 8.5 million pounds of the 9.3 million pounds of 2002 NDM held by R&J at the time of the warehouse examination had since been shipped to Van Tassell or "sold to the contract in Idaho."  Upon information and belief, these representations were intentionally and knowingly false, in that they were intended to indicate and did indicate that the NDM had been shipped to Idaho, when in fact R&J shipped no NDM to Idaho, but rather shipped it to various ports for exportation from the United States.

**F.     R&J's involvement in the exportation of 2002 and 2003 program NDM**

67.     During the period November 4, 2003 through March 25, 2004, R&J, Goodwin and Carter knowingly participated in the exportation from the United States of millions of pounds of 2002 and 2003 USDA drought relief program NDM.

68.     R&J, Goodwin and Carter so participated by selling the NDM to another party with the knowledge and intent that the NDM was to be exported, and by arranging and participating in the shipment of the 2002 and 2003 program NDM from an R&J's DOD

21

warehouse in Ogden, Utah to various seaports and other points of exportation from the United States, including by loading the NDM into sea cargo containers at R&J's warehouse in Ogden, all with the intent and knowledge that the NDM would be exported from the United States and that it would not be used in accordance with the restrictions applicable to the NDM.

69.     As a result of its actions in participating in the exportation of 2002 and 2003 program NDM, R&J, Goodwin and Carter received and were aware that they were receiving a price for the NDM that was significantly higher than any price for which they could have sold the NDM for use within the program restrictions.

70.     Between November 4, 2003 and March 25, 2004, R&J, Goodwin and Carter sold approximately 25,801,757 pounds of 2002 and 2003 drought relief program NDM for exportation from the United States, and upon information and belief, all or substantially all of this NDM was in fact exported.

71.     R&J, Goodwin and Carter received a total price of approximately $5,832,316 for the NDM that they sold for exportation between November 4, 2003 and March 25, 2004, at a substantial profit to R&J, Goodwin and Carter.

72.     R&J, Goodwin and Carter were aware at all times that the NDM that they sold for exportation would not be used in accordance with the restrictions applicable to NDM distributed under the 2002 and 2003 drought relief programs, and that all of the NDM that they sold during the period November 4, 2003 through March 25, 2004 was subject to these restrictions.

73.     Upon information and belief, R&J, Goodwin and Carter continued after March 25, 2004 to participate in the acquisition and exportation of NDM distributed by the USDA under the 2002 or 2003 drought relief program, and gained substantial income therefrom.

74.     Of the approximately 23 2003 NDM Order Forms that R&J caused to be submitted to the USDA on behalf of R&J, approximately 17 were submitted after the date by which R&J is now known to have begun participating in the exportation of 2002 and 2003 NDM. Upon information and belief, with respect to most or all of the 2003 drought relief program NDM that R&J caused to be ordered from the USDA, R&J intended at the time it did so that the NDM would be exported and thus intended that the NDM be used in violation of the restrictions on usage applicable to the NDM, and in violation of the certifications on 2003 NDM Order Forms that were required to secure delivery of the NDM by the USDA.

75.     Upon information and belief, all or substantially all of the 2003 drought relief program NDM that R&J caused to be ordered from the USDA was exported by or with the knowing participation of R&J.

**Claims and Prayer for Relief**

**FIRST CAUSE OF ACTION**

(**False Claims Act, 31 U.S.C. § 3729(a)(1)**)

(**As to Defendants Carter, Goodwin, and R&J Feed, Inc.**)

76.     The United States repeats and re-alleges the allegations contained in paragraphs 1-75 as though fully set forth herein.

77.     By virtue of the acts described above with regard to the participation of Defendants Carter, Goodwin, and R&J Feed, Inc. in the 2002 and/or 2003 NDM programs, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1).

78.     As a result of Defendants' false or fraudulent acts described above, the United States has suffered damages, and therefore is entitled to treble damages under the False Claims

Case 4:10-cv-00607-GAF   Document 1   Filed 06/16/10   Page 23 of 26

Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## SECOND CAUSE OF ACTION

### (False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

### (As to Defendants Carter, Goodwin, and R&J Feed, Inc.)

79.     The United States repeats and re-alleges the allegations contained in paragraphs 1-75 as though fully set forth herein.

80.     By virtue of the acts described above with regard to the participation of Defendants Carter, Goodwin, and R&J Feed, Inc. in the 2002 and/or 2003 NDM programs, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

81.     As a result of Defendants' false or fraudulent acts described above, the United States has suffered damages, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

### (As to All Defendants)

82.     The United States repeats and re-alleges the allegations contained in paragraphs 1-75 as though fully set forth herein.

83.     By virtue of the acts described above with regard to the participation of all Defendants in the 2002 and/or 2003 NDM programs, the Defendants were unjustly enriched, or received NDM and cash payments to which they were not entitled, through false and fraudulent

24

statements to the USDA and through violation of the programs' requirements and restrictions, and on which shipments and receipt of the NDM was contingent.   As a result, the United States is entitled to the entire value of the NDM the Defendants misappropriated under the drought assistance initiatives, in an amount to be determined at trial.

Wherefore, Plaintiff requests that judgment be entered in its favor as follows:

**AS TO THE FIRST CAUSE OF ACTION**:

As against Defendants R&J, Carter and Goodwin, judgment in an amount equal to:

1.     Actual damages in an amount to be established at trial, trebled;

2.     For each instance in which Defendants knowingly presented or caused to be presented to an officer or employee of the United States Government a false or fraudulent claim for payment or approval, civil monetary penalties of not less than $5,500 and not more than $11,000;

**AS TO THE SECOND CAUSE OF ACTION:**

As against Defendants R&J, Carter and Goodwin, judgment in an amount equal to:

1.     Actual damages in an amount to be established at trial, trebled;

2.     For each instance in which Defendants knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim, civil monetary penalties of not less than $5,500 and not more than $11,000.

**AS TO THE THIRD CAUSE OF ACTION**:

As against all Defendants, damages and/or disgorgement of amounts by which Defendants were unjustly enriched, in amounts to be determined at trial.

Plaintiff further prays that judgment be entered in its favor for its costs incurred herein, for any interest to which it may be entitled, and for any further relief the Court deems appropriate.

Respectfully submitted,

TONY WEST
Assistant Attorney General
Civil Division
United States Department of Justice

By:     *s/ Charles Schmitz*
        Joyce R. Branda
        Michal Tingle
        Charles Schmitz, Conn. Bar No. 429457
        U.S. Department of Justice
        Commercial Litigation Branch
        P.O. Box 261
        Ben Franklin Station
        Washington, D.C. 20044
        Telephone:  (202) 514-8746
        Facsimile:  (202) 307-3852
        Email:  Charles.Schmitz@usdoj.gov

        Beth Phillips
        United States Attorney

By:     *s/ Charles M. Thomas*
        Charles M. Thomas, MO Bar No. 28522
        Assistant United States Attorney
        Charles Evans Whittaker Courthouse
        400 East Ninth Street, Room 5510
        Kansas City, Missouri 64106
        Telephone: (816) 426-3130
        Facsimile: (816) 426-3165
        Email:  charles.thomas@usdoj.gov
        Attorney for Defendants

Dated: June 16, 2010

26